IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
DEC 15 2006
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

EARTHA COLLIER,

                          Plaintiff,          Case NO. 04 C 7791

          v.

                                              Hon. Harry D. Leinenweber
ELGIN COMMUNITY COLLEGE, DR.
MICHAEL SHIRLEY, RUSS FAHRNER,
and JOHN COFFIN,

                          Defendants.

## MEMORANDUM OPINION AND ORDER

Defendants Elgin Community College ("ECC"), Dr. Michael
Shirley ("Shirley"), Russ Fahrner ("Fahrner") and John Coffin
("Coffin")(hereinafter, the "Defendants") move for Summary Judgment
on Plaintiff Dr. Eartha Collier's (hereinafter, "Collier") claims
of racial discrimination and retaliation under Title VII; a hostile
work environment; and violations of Sections 1981 and 1983.  For
the reasons discussed below, Defendants' Motion for Summary
Judgment is **granted**.

### I.  FACTUAL BACKGROUND

The following facts are taken from the parties' Local
Rule 56.1 submissions.  Because this is a summary judgment motion,
all reasonable inferences are settled in Collier's favor.

ECC is a community college located in Elgin, Illinois.
Shirley is the current President of ECC and has held the position

since 1998. Fahrner was the Dean of Students at ECC from 1998 until his retirement in 2005. Coffin is the Associate Dean of Counseling and Career Services at ECC. He has held the position since August 1997. Coffin reported directly to Fahrner.

Collier received a Ph.D. in Counselor Education from the University of South Carolina and a Master in Arts degree in Rehabilitation Counseling from South Carolina State University. In August 1999, Collier was hired by ECC to fill a temporary, one-year counseling position while a full-time tenured counselor, Ethel Russell-Ajisomo, was on a one-year leave of absence. Although Collier was initially offered $43,988.00 for the position, she was ultimately paid $51,908.00 according to the salary schedule contained in the collective bargaining agreement (the "Agreement"). The Agreement provides the applicable salary for an individual depending on her level of education and creditable years of experience.

When Russell-Ajisomo did not return to ECC, Collier was hired as a full-time, tenure track counselor. She was given credit toward tenure for her previous year of service. As a counselor, Collier was to provide educational and professional counseling to students, participate in the counseling program and assist in other activities. One of the activities was to teach a General Student Development course ("GSD"). It is disputed whether teaching the course was optional for counselors.

In January 1996, ECC adopted an Affirmative Action Statement prohibiting discrimination as well as a sexual harassment policy containing a complaint procedure. ECC also provided training on the laws preventing sexual harassment and held workshops regarding diverse hiring policies. Collier, Coffin and Fahrner attended the workshop on diverse hiring practices.

### A. September 2000 Meeting

Shortly after Collier began working at ECC, she heard either Judy Marvos or Beth Santell, two colleagues, refer to her as an "affirmative action hire." In September 2000, a special staff meeting was called by Coffin to address Collier's concerns that her colleagues were treating her differently because of her race. At the meeting, Collier accused several counselors of racist behavior. The counselors felt that Collier attacked them. After the meeting, there was tension between Collier and her co-workers, and co-workers began to complain when Collier needed coverage due to illness.

Collier alleges that she heard herself referred to a second time as an affirmative action hire when her door was shut. Carrie Gorr, a part-time counselor, commented before Collier was hired that Collier received the position due to the affirmative action policy.

## B. Tenure Evaluation Process

In order to attain tenure, a counselor must go through an evaluation process during the first three years of her employment. The counselor is reviewed by a tenure and evaluation committee consisting of three tenured counselors. The tenure process also includes yearly observations, student evaluations, content assessment, administrator feedback and an annual assessment. Following the tenure committee's evaluation, Coffin conveys the recommendation to the Vice President of Instruction and the President. The final decision of whether to award tenure is made by the Board of Trustees.

Collier's tenure committee consisted of Chris Lozier ("Lozier"), Arturo Vasquez ("Vasquez"), and Beth Santell. During her process, a new student evaluation form was developed. Collier objected to its use but was told by Lozier that he was authorized to use it because he was part of the "good old boy" network. After Collier's objection, the former version of the student evaluation form was used. On February 13, 2002, Collier was presented with her tenure form for signature. She wrote on the form, "It is my belief that I have been treated unfairly in the evaluation and tenure process. I further believe I have been the subject of racial bias and hostility." Collier alleges that she was treated differently in the tenure process from Patti Jachowicz ("Jackowicz"), who received tenure a year earlier. Only Arturo

Vasquez was a member of both Collier's and Jachowicz's tenure committees. Vasquez observed differences in the two tenure evaluation processes including: Jachowicz received strong support from all of her committee members, only Vasquez strongly supported Collier; Collier received greater scrutiny, including a higher number of meetings; and there was a list of concerns presented to Coffin regarding Collier.

On February 14, 2002, Collier met with Coffin and Fahrner to discuss the statement on her tenure form. Collier claims that she was told she had to remove the statement from the form. On February 28, 2002, Fahrner sent Collier and Coffin an e-mail that stated:

> When the three of us discussed the tenure evaluation, we all concluded that 2 activities would occur: re-signing the evaluation document and a report to me on how Eartha can experience being accepted as a member of the team. As of this date, I have not received either. Do we need to have another meeting? Hope to hear from you by Monday regarding what we discussed.

Collier Ex. 9. Between February 14, 2002 and April 22, 2002 Coffin asked Collier if she had signed a new tenure form without the statement. Coffin allegedly told Collier that if she left the statement on the form it would come back to "haunt" her.

## C. Investigation

On April 22, 2002, Fahrner sent a second e-mail to Collier stating that he believed she had agreed to remove the statement and submit

a list of conditions to contribute to her success at the counseling center. Collier responded to the e-mail stating that she would not retract the statement. As a result, Fahrner responded that he was forwarding her complaint to Roger Spayer ("Spayer"), the Managing Director of Human Resources. Collier responded that she did not want Spayer involved and had not asked for a complaint to be filed. In April 2002, Spayer spoke with Fahrner and Coffin regarding Collier's allegations. Spayer attempted to speak with Collier about her allegations but she informed him that she was not interested in filing a complaint with Human Resources.

On April 17, 1002, Collier sent an e-mail to Shirley and the Vice-President of Instruction, Judy Jobe ("Jobe"), requesting a meeting to discuss her employment. Jobe responded that Shirley was out of town but she would try to arrange the meeting. On May 20, 2002, Jobe sent Collier an e-mail requesting a description of the nature of employment conditions that Collier referred to in her April 17, 2002 e-mail. On June 30, 2002 Collier responded to the e-mail stating that she had concerns regarding the tenure process, Coffin's bias in decision-making, and her colleagues' interference with her ability to do her job.

In September 2002, ECC hired a law firm specializing in employment discrimination to investigate Collier's allegations. Spayer informed Collier of the investigation but she refused to meet with or be interviewed by the lawyers. On October 9, 2002 she

informed Spayer by e-mail that she would not meet with the lawyers and any further attempts by them to contact her would be harassment. The law firm found that Collier's colleagues thought that she took too many sick days. Although Collier took more sick days than her colleagues, she never exceeded her allotted time. The law firm concluded that Collier had not been subjected to racial bias or harassment.

### E. GSD Classes

Coffin was responsible for assigning counselors to teach GSD courses. Collier alleges that when she was hired, she was told that teaching the course was optional. Marilyn Binda ("Binda"), one of the two most senior counselors, resisted teaching the classes. During the fall 2002 semester, Coffin required all of the full-time counselors, except for the two most senior (including Binda), to teach GSD courses. Collier contends that teaching GSD courses was optional for white counselors but that she was required to teach the course. In August 2002, Collier informed Coffin that she did not believe teaching was a requirement. He informed her that teaching the courses was part of her job description and there would be no additional compensation for them.

### F. Absences

In November 2002, Collier was elected to represent her colleagues as a member of the faculty negotiation committee. After attending a November 26, 2002 faculty negotiation meeting, she was

informed of a meeting scheduled for December 11, 2002 to discuss her failure to inform Coffin she would be taking time off to attend the meeting. On December 10, 2002 Collier sent an e-mail to her union representative, Sherry Hellmuth ("Hellmuth"), informing her that she was withdrawing from the negotiating team due to the pressure she was receiving from Coffin. On December 12, 2002, Collier, Coffin, Spayer and Hellmuth attended a meeting to address Collier's absence on November 26, 2002. Collier claims that she had adequate coverage to attend the negotiation meeting pursuant to Coffin's directions. Although Coffin requested that Collier personally inform him when she would be absent for such meetings, Collier alleges that he had not instructed her to do so previously.

In May 2003, Collier attended a professional development conference. She sought and received approval to attend the meeting from the Faculty Development Committee. Despite having signed up for the meeting, she scheduled herself to work during those days. She realized her mistake on May 16, 2003 and discussed it with Coffin. She was unable to obtain adequate coverage for those days but went anyway. When she returned from the conference, Coffin scheduled another meeting, which Hellmuth and Spayer attended, to discuss the proper procedures to be taken when a counselor expects to be absent.

One June 5, 2003, Collier filed a charge of discrimination with the Illinois Department of Human Rights alleging race discrimination and retaliation.

## II. **ANALYSIS**

### A. **Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the Court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Associates, Inc.*, 914

F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

## B. Race Discrimination

Collier brings her race discrimination claims under Title VII and 42 U.S.C. § 1981, which both prohibit employers from discriminating against employees on the basis of their race. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1169 (7th Cir. 1997). Collier may use either the direct or indirect method to show that issues of fact exist on her Title VII or 1981 race discrimination claims. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006).

To establish race discrimination under the direct method, Collier must present evidence that she suffered an adverse employment action and that her race was a motivating factor. To do so, she may rely on either direct or circumstantial evidence. *Logan v. Kautex Textron North America*, 259 F.3d 635, 638 (7th Cir. 2001). Collier maintains that she can proceed under the direct method using both direct and circumstantial evidence. Direct evidence "essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence may consist of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at employees in the protected group. *Id.* Circumstantial evidence can

also be shown where a similarly situated employee received more favorable treatment. *Phelan v. Cook County*, 463 F.3d 773, 781 (7th Cir. 2006).

Collier claims that she was subject to several adverse employment actions as a result of her race. First, she was initially offered a lower salary than she was entitled to receive under the Agreement. Second, she claims Coffin made comments that she was paid too much. Third, she claims her tenure process was different because she was subject to greater scrutiny and there was a new student evaluation form proposed during her process. Collier alleges that Arturo Vasquez, a member of both Collier's and Jachowicz's tenure committees, commented that the evaluation processes were different. Collier did not have the same support as Jachowicz from her colleagues, was subject to greater scrutiny by the committee and a new student evaluation was developed during her process. At the end of the tenure process, she was initially asked to sign a tenure form that was marked for renewal instead of tenure. Finally, Collier contends that she was forced to teach GSD courses.

Collier claims that her race was a motivating factor in the adverse actions. As support for this argument, she alleges that shortly after she was hired, she heard co-workers refer to her as an "affirmative action hire." She also claims that after the 2000 meeting when she attempted to address her concerns regarding

racism, there was antagonism and tension between Collier and her colleagues increased. Specifically, her colleagues were less likely to cover for her when she was sick. Collier also refers to other staff members who were members of minority groups feeling that they had been discriminated against.

Collier fails to show that she suffered an adverse employment action. "The idea behind requiring proof of adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in a workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000). An adverse employment action is one that materially affects the terms and conditions of employment. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). A plaintiff can establish an adverse action with evidence of termination, demotion, decrease in salary or benefits, or significantly diminished responsibilities. *Id.* Not everything that makes an employee unhappy is an adverse action, rather, there must be some type of material change in the terms or conditions of employment. *See Haugerud v. Amery School Dist.*, 259 F.3d 678, 690-91 (7th Cir. 2001).

Assuming the above allegations are true, they do not establish that Collier suffered an adverse employment action due to her race. Although Jachowicz's tenure process may have differed from Collier's, Jachowicz had been with ECC longer than Collier. She

also had a different tenure committee with the exception of one individual. Collier's allegation that she received less support and greater scrutiny does not rise to the level of an adverse employment action. Although a new student evaluation form was developed, it was not used for Collier after she objected to it. In the end, Collier was tenured after being with ECC for the minimum required years.

The comments about affirmative action do not rise to the level of seriousness needed to alter the terms and conditions of her employment. Isolated comments about an employee's race are not an adverse action. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Likewise, Coffin's statements that Collier made too much money did not affect her compensation and do not constitute an adverse employment action. In addition, Coffin's statement was not about Collier's race. Id. General antagonism by Collier's co-workers does not constitute an adverse employment action. Title VII is not intended to be a general civility code. Id. Finally, teaching GSD courses did not materially change the conditions of Collier's employment. She does not dispute that except for the two most senior counselors who were retiring at the end of the year, all of her colleagues were required to teach the courses during the 2002-2003 school year.

Further, Collier fails to show that the alleged adverse actions were motivated by her race. Her colleagues' comments that

she was an affirmative action hire or the perceived general antagonism lack a substantial connection to her initial salary offer or her tenure process. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (holding that derogatory statements made by a non-decision maker are not evidence that an adverse decision was discriminatory). Likewise, Coffin's alleged comments that Collier's salary was too high does not establish that the alleged adverse employment actions were motivated by race. *Ismail v. Potter*, No. 05 C. 409, 2006 WL 2989293, at *6 (N.D. Ill. Oct. 18, 2006) ("Where a supervisor does not have ultimate authority over adverse employment actions, any discriminatory comments made by that supervisor is not direct evidence that discriminatory animus motivated the decision."), citing *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). Collier fails to raise a genuine issue of material fact as to her race discrimination claims. Thus, summary judgment is granted on these claims.

## C. Retaliation

42 U.S.C. § 2000 prevents an employer or labor organization from discriminating against someone because "he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e).

To overcome Defendants' summary judgment motion in her retaliation claim, Collier must show either direct evidence of retaliation or indirect evidence of the employer's retaliatory intent using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003). Under the direct method, Collier must show (1) protected activity; (2) adverse action; and (3) a casual connection between the two. The adverse action requires plaintiff to show that "a reasonable employee would have found the challenged action materially adverse, which [] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006).

Under *McDonnell*, Collier must first establish a prima facie case of discrimination by showing that she (1) engaged in a protected activity under Title VII; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; (4) a causal connection exists between the adverse action and the protected activity; and (5) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Williams v. Illinois Dept. Of* Corrections, No. 05 C 2151, 2006 WL 2495020, at *6 (N.D. Ill. Aug. 25, 2006); *Hill v. American General Finance, Inc.,* 218 F.3d 639, 645 (7th

Cir.2000). The burden then shifts to the employer to articulate a non-discriminatory reason for its actions. If the employer succeeds, Collier may still prevail by demonstrating that the employer's stated reasons for the challenged action are merely pretextual and the employer's actual reason was discriminatory. *Rennie v. Dalton,* 3 F.3d 1100, 1108-09 (7th Cir.1993).

Collier attempts to prove the retaliation through the direct method, using direct and circumstantial evidence to show she engaged in protected activity and suffered a resulting adverse employment action. *See Sylvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 902 (7th Cir. 2006)("if [the plaintiff] can prove by means of circumstantial evidence that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains, that is fine" under the direct method.").

Collier alleges that Coffin retaliated against her on three occasions for writing the statement regarding racial bias on her tenure form. First, she was required to teach GSD classes because she refused to retract the statement. Collier alleges that teaching the classes had always been optional until she refused to retract the statement. Then, in Fall 2002, she was forced to teach. Coffin allegedly told her that if she did not retract the statement, it would come back to "haunt" her in other ways. Second, Collier contends that she was forced to resign from the

faculty negotiating team. Coffin had instructed Collier that she could serve as a representative and attend the meetings as long as she obtained adequate coverage. In November 2002, after Collier attended a negotiation meeting, she was summoned to a meeting in Human Resources and was accused of not obtaining adequate coverage for the counseling department. Collier alleges that her predecessor, Chris Lozier, a white male, was never disciplined for attending such meetings.

Finally, Collier alleges she was retaliated against when she was disciplined for attending an approved professional development conference. She admittedly scheduled counseling appointments during the time she was to attend the conference. However, she realized her mistake and attempted to remedy her schedule by rescheduling appointments or asking other counselors to cover for her. When she returned from the meeting, she was required to attend a second Human Resources meeting. Collier alleges that her white colleagues never received such treatment. Specifically, Chris Lozier scheduled a two-week vacation and did not obtain coverage.

Collier fails to present sufficient proof to survive summary judgment. In order to prove retaliation under the direct method, she must present "a convincing mosaic of circumstantial evidence." *Sylvester*, 453 F.3d at 903. The case can be made by assembling a number of pieces of evidence that, taken on a whole, provide strong

support that all point in the same direction. *Id.* Collier argues that she was pressured to retract her statement from her tenure form and then retaliated against for refusing to do so. The record suggests that rather than retaliating against Collier, Coffin and his superiors took the proper steps to ensure that the concerns contained in her statement were properly addressed. She was asked by Coffin and Fahrner whether she wanted to file a complaint with the Human Resources. Despite Collier's unexplained desire to refrain from filing a formal complaint, Fahrner forwarded her statement to Human Resources so that a proper investigation could take place. After Collier's e-mails to Shirley and Jobe, combined with the statement on her tenure form, ECC hired an outside law firm to investigate and address Collier's allegations. Collier refused to participate in the investigation.

Additionally, teaching the GSD course does not qualify as an adverse employment action. Although Collier contends that Coffin forced her to teach the class after she refused to retract the statement, the decision as to which counselors would teach GSD had been made months before Collier's conversation with Coffin. Collier does not dispute that all of her colleagues taught GSD courses in the fall of 2002, with the exception of the two most senior counselors. Those two counselors had taught the course in the past. Collier had also taught the course in the past without complaint.

Collier also argues that Coffin retaliated against her by holding two meetings with a human resources member to address her absences. She contends that her white colleagues were never subjected to such meetings. The practice for counselors was to contact Coffin if they were taking time off and to arrange proper coverage. Collier agrees that she did not notify Coffin she would be out of the counseling center in order to attend the faculty negotiation meeting. She also admits that she inadvertently scheduled appointments while she was out of the office for the professional development conference. Both meetings were to address these absences. Collier also admits that she was not disciplined as a result of either meeting and nothing was put in her personnel file. Thus, Collier fails under both the direct and the indirect methods because she does not establish that she was meeting Coffin's legitimate expectations, that she was subject to an adverse action, or that a causal connection existed between the alleged adverse actions and her statement regarding racial bias.

As such, summary judgment is granted with regard to Collier's retaliation claim.

### D.  Hostile Work Environment

To establish a racially hostile work environment, Collier must show that she (1) was subjected to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of her employment; and (4)

there is a basis for employer liability. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). In assessing the severity or pervasiveness of the Defendants' conduct, the Court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999). The Court must apply both an objective and subjective standard. Collier's evidence must indicate that (1) a reasonable person would perceive her environment to be hostile or abusive, and (2) she subjectively perceived the environment to be so. *Faragher*, 524 U.S. at 787.

Collier alleges that she was harassed due to her race. As support for her allegations, she submits the following evidence: she was referred to as an affirmative action hire, Coffin and Fahrner requested that she remove her added statement from her tenure form, Lozier referred to himself as part of the good old boys network, she was required to attend meetings with Human Resources on two occasions to explain absences and an article written on diversity. Importantly, these alleged incidents took place over the course of several years.

Collier has not produced evidence to establish either that the harassment was based on her race or that it was sufficiently severe

or pervasive that it transformed her environment into a hostile and abusive working environment. Assuming that the incidents cited by Collier qualify as harassment, she still cannot show the harassment was based on her race. She must show that it was sufficiently connected to her race in character or purpose before the Court will construe it as being motivated by racial hostility. *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005). As stated above, Collier fails to produce sufficient direct evidence that the actions were based on her race. She points to a few isolated comments that she was an affirmative action hire. She also alleges that her co-workers were not as willing to cover for her in her absences as they were for Caucasian employees. However, not every perceived unfairness in the workplace may be ascribed to discriminatory motivation because the complaining employee belongs to a racial minority. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005)(citation omitted). Rather, the alleged harassment must be "sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Id.* at 864 (citations omitted).

Further, the behavior that Collier points to is neither severe nor pervasive. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005)(conduct that was confined to verbal out-bursts and never became physically threatening was not severe or pervasive). When

she complained regarding the affirmative action statements, her supervisor called a special meeting to address her concerns. She did not remove the statement regarding racial bias from her tenure form and, as a result, ECC investigated her claims. Although she was summoned to meetings to discuss absences, she was never disciplined. These incidents were not sufficiently severe or pervasive to amount to an environment that could be perceived as objectively abusive.

### E. Section 1983

Count IV of Collier's Amended Complaint asserts sex discrimination under Section 1983. However, Collier does not oppose Defendants' Motion for Summary Judgment on this Count. Accordingly, summary judgment is granted on Collier's Section 1983 claims.

### III. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment **is granted**.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: December 15, 2006

- 22 -